Thomas McBRIEN and Marie McBrien, husband and wife, Plaintiffs

v.

**MASTER DEVELOPMENT, INC., Defendant.**

**Civ. No. 90–7373.**

United States District Court, E.D. Pennsylvania.

Jan. 6, 1994.

Robert A. Lechowicz, Robert A. Lechowicz Law Offices, Sellersville, PA, for plaintiffs.

Geoffrey L. Steiert, Collingswood, NJ and Gregory H. Melick, Dyer & Harrington, Medford, NJ, for defendant.

## OPINION

LOUIS H. POLLAK, District Judge.

This diversity action, sounding in contract, was the subject of a bench trial. This opinion constitutes my findings of fact and conclusions of law.

Plaintiffs Thomas and Marie McBrien, husband and wife, own a large tract of land located along the Delaware River in Bucks County, Pennsylvania. Defendant Master Development, Inc. ("MDI") is a New Jersey corporation engaged in the business of investment and speculation in real estate. On April 18, 1989, plaintiffs and MDI signed a Letter of Intent which provided that, if certain conditions were met, the parties would in the next 120 days sign an agreement of sale by which plaintiffs would sell the tract of land to MDI. Although the parties never signed the agreement of sale contemplated by the Letter of Intent, plaintiffs now seek damages for MDI's failure to make payments allegedly required by the Letter of Intent.

Part I of this opinion outlines the factual background and procedural history of this case. Part II analyzes the legal issues raised by this action.

### I.

The tract of land owned by plaintiffs consists of various parcels of real estate along the Delaware River that were purchased by the plaintiffs in separate transactions between 1985 and 1988. The total acreage of the real estate is approximately 279 acres, including a 47–acre parcel on which is located the Indian Rock Inn ("Inn"). Thomas McBrien ("McBrien") testified that he and his wife bought the real estate in order to live on the land, to develop residential housing, and to establish recreational facilities. Since purchasing the property, McBrien has continued to live on the land and operate a canoeing, rafting and tubing business.

McBrien testified that, although he would have liked to develop the property himself, financial difficulties forced him to seek outside investors. Because he had incurred substantial legal bills in connection with his efforts to develop the property, and because he had had a rainy canoeing season that caused temporary cash flow problems, McBrien began to market the property in 1988. He listed the property with, among others, a realtor named Richard Murphy. Murphy contacted MDI to inquire whether MDI might be interested in plaintiffs' property. When Mark Fraser, the president of MDI, expressed interest, Murphy suggested that a meeting be held at the site.

On April 6, 1989, Fraser and Robert Ulrich, a vice president of MDI, met with McBrien and Murphy at the property. Also in attendance was engineer John Rahencamp. Rahencamp's company, John Rahencamp Consultants, is engaged in the business of performing engineering and feasibility studies in connection with the development of real estate. Rahencamp attended the meeting at Murphy's request. The group toured the property and discussed potential development. Rahencamp asserted that a developer could build 250 to 500 lots on the property— that is, one to two lots per acre. Rahencamp may, however, have said that the developer would not be able to build that many lots without first obtaining a "curative amendment"—that is, a change in the applicable zoning requirements.[1] Although McBrien indicated that his preference was for more limited development, he did not mention any obstacles to the denser development Rahencamp and MDI discussed.

Because Fraser and Ulrich were impressed with the property and its development potential, they began to negotiate terms under which MDI would purchase the property. Immediately after the April 6 meeting, McBrien gave Fraser and Ulrich a list of his debts. McBrien indicated that he

---

1. Fraser and Ulrich testified that Rahencamp said that 250 lots could be built without a curative amendment; 500 lots could be built with a curative amendment. MDI contends that McBrien knew, from prior feasibility studies he had had done, that 250 lots could not be built without a curative amendment, yet failed to correct Rahencamp's prediction. Because I do not reach the issue of whether MDI's duty to pay $100,000 under the Letter of Intent is excused by fraud on the part of the plaintiffs, I need not resolve the disputed factual issues relevant to the question whether fraud occurred.

was behind on his mortgages and his real estate taxes and that he feared foreclosure. Fraser and Ulrich met with McBrien in order to try to draft a letter of intent that would, among other things, solve McBrien's short term financial problems and protect MDI's interest in the property.

In a letter of intent dated April 14, 1989, MDI proposed to purchase the property for a total of $1,650,000. Over the next several days, plaintiffs and MDI continued to engage in negotiations concerning the sale of the property. The result was a revised letter of intent ("Letter of Intent") which was dated and executed by the parties on April 18, 1989 (Plaintiffs' Exhibit 2). Under the terms of the Letter of Intent, any profit plaintiffs might make from the sale of the property to MDI would come from a five percent commission on revenues raised from resale of lots by MDI, or, alternatively, from a forty percent commission on the revenue realized from MDI's resale of the property as a whole. The total purchase price was described in the Letter of Intent as $2,150,000. Two million dollars would be in the form of two first mortgages obtained by MDI: a first mortgage on the land with First National Bank of Newtown, in the amount of $1,500,-000; and a first mortgage on the Inn with the Bank of Old York Road, in the amount of $500,000. Fifty thousand dollars was a deposit that MDI paid up front, that McBrien used to bring his mortgages up to date. The characterization of the remaining one hundred thousand dollars—and the condition upon which it would become due—is one of the subjects of the dispute before this court. The relevant provisions of the Letter of Intent stated:

> 4. *Review Period.* Buyer shall have a period of one hundred twenty (120) days commencing with the receipt by Buyer of a copy of this letter executed by Seller, to evaluate the general condition of the property; to determine the feasibility of the proposed purchase, including the physical and economic feasibility; to verify representations made by the Seller, and to satisfy the conditions referred to in this letter. During the Review Period, Buyer and Seller shall negotiate an Agreement of Sale to be executed by the Buyer and Seller on or before the termination of the Review Period. Notwithstanding the foregoing, if at any time during the Review Period Buyer shall elect, for any reason, not to proceed with the intended purchase, Buyer shall so notify the Seller in writing and this Letter of Intent shall be null and void and neither Seller nor Buyer shall have any further right or obligation hereunder. No representations made by Seller shall be relied upon by Buyer at the expiration of the review period....

> 6. *Deposit.* Upon the execution of this Letter of Intent by Seller and Buyer, Buyer shall deposit an amount equal to Fifty Thousand Dollars ($50,000.00), which shall be released to Seller. Upon the expiration of the period referred to in Paragraph 4, Buyer will deposit an amount equal to One Hundred Thousand Dollars ($100,000.00) which shall be released to Seller. The deposit(s) shall secure Buyer's obligations under this Letter and the subsequent Agreement of Sale and Buyer's liability shall be limited to same.

The Letter of Intent also required MDI to pay the real estate taxes on the property and to make the monthly mortgage payments that came due, beginning on the date the Letter of Intent was signed. Finally, the Letter of Intent gave MDI access to the property for the purposes of conducting feasibility and other studies of the land, and the Letter provided that work produced in connection with such studies would become the property of the Seller in the event that no settlement occurred.

Fraser testified that he understood the 120 day review period described in paragraph 4 of the Letter of Intent to have two purposes: to enable MDI and McBrien to meet with the banks holding mortgages on the property and the Inn and discuss having MDI assume those mortgages, and to give MDI time to have feasibility and engineering studies done on the property. Ulrich, Fraser and McBrien did indeed meet with the First National Bank of Newtown and the Bank of Old York Road on June 7, 1989, and MDI proposed that it would assume the mortgages. The banks, however, both rejected MDI's proposal, on or around June 21, 1989. Fra-

ser testified that he felt that MDI had other financing options: MDI could make the mortgage payments through McBrien, could raise additional funds through outside investors and pay off the mortgages, or could obtain a bank loan in addition to funding from investors and use the money to pay off the mortgages. Fraser explained that, at that point, MDI put the financing issue on hold until it received the results of feasibility studies.

On May 1, 1989, MDI hired John Rahencamp Consultants ("JRC") to perform feasibility and engineering studies of the property. As time passed, JRC gradually modified its predictions for the developability of the property. Towards the end of May, 1989, Skip Weiner from JRC told Fraser in a phone conversation that he thought MDI could get at most 100 to 125 lots without a curative amendment. At a meeting on June 28, 1989, Skip Weiner told Ulrich and Fraser that MDI might get as few as eighty-four lots, but that eighty-four lots—built with traditional septic systems—was the minimum they would get. Although MDI principals were less enthusiastic about the property than when they believed that they could build 250 lots on the property, both Ulrich and Fraser testified that they still thought a development with eighty-four lots would be a profitable venture.

The 120–day review period provided in the Letter of Intent would have expired on approximately August 17, 1989. At a meeting on August 3, 1989, Skip Weiner told Fraser and Ulrich that JRC would not complete the feasibility studies in time to make the deadline the Letter of Intent provided for signing an agreement of sale. Fraser testified that he had John Dyer, the attorney then representing MDI, call John Rufe, the attorney then representing McBrien, to ask for additional time. Although there is a dispute about the implications of what ensued, it is clear that the parties at least agreed to continue negotiations on the agreement of sale beyond August 17. Indeed, McBrien testified that he authorized Rufe to grant an extension of time for MDI to conclude the engineering studies. (12/1/92 Tr. at 151). Between August 15 and September 14, the parties also continued to work on drafts of an agreement of sale.

MDI received no further significant information from JRC until September 14, 1989, when a meeting was held between representatives of MDI and JRC. According to Fraser's uncontradicted testimony, at that meeting, Rahencamp told MDI that, with traditional septic systems, MDI could hope for no more than fifteen developable lots on the property. He added that MDI might be able to get fifty lots with a more expensive septic system. Alternatively, he suggested that MDI try to obtain a curative amendment, but noted that to do so would take a long time and cost a lot of money. Fraser testified that the meeting ended abruptly after JRC announced its findings. MDI immediately scheduled a meeting with McBrien for the next day.

On September 15, 1989, Fraser, Ulrich, Dyer, and Rod Mumma (an MDI project manager) met with McBrien, his wife, and Rufe. According to Fraser's testimony, Mumma opened the meeting by stating that it would not be a very pleasant meeting. The MDI representatives then explained what JRC had told them the day before. MDI indicated that it could not make any money on the project based on the most recent findings, and that no agreement of sale would be signed. Fraser testified that McBrien appeared stunned at the prospect that the parties would not be able to go to settlement. The meeting ended shortly after MDI indicated that it did not intend to sign an agreement.

On September 21, 1989, Dyer received a phone call from Rufe. According to Dyer, Rufe said that McBrien had instructed him to demand the $100,000 that had come due on August 18, 1989. Dyer testified that he was surprised and told Rufe that, in light of the fact that MDI had paid McBrien $50,000, had paid his mortgages, and had lost thousands of dollars on the deal, such a demand was inappropriate. Dyer testified that he relayed this demand to Fraser, who felt that McBrien's position was a crazy one to take. (1/14/93 Tr. at 70–71). In a letter to Dyer dated September 21, 1989 confirming the phone conversation of the previous day, Rufe

made the following demands: (1) that MDI make the August, 1989 mortgage payment to First National and either (a) pay McBrien $50,000 in settlement of all its obligations under paragraph 6 of the Letter of Intent, or (b) pay McBrien $100,000 to be fully reimbursed to MDI on sale or development of the tract by McBrien or any other developer; and (2) that MDI turn over all plans, engineering studies, test results, etc. in its possession as a result of the feasibility studies. (Plaintiffs' Exh. 4).

The parties were unable to settle their differences. On or about September 20, 1990, plaintiffs filed a complaint in the Court of Common Pleas of Bucks County, Pennsylvania. Plaintiffs made claims for damages based upon MDI's failure to comply with the following obligations allegedly required by the Letter of Intent: (1) to pay McBrien $100,000; (2) to make mortgage payments for August 1989; (3) to pay real estate taxes; and (4) to turn over engineering and other studies.

On November 19, 1990, the matter was removed to this court on the basis of diversity jurisdiction. The case was tried before me in a six-day bench trial. In the plaintiffs' proposed findings of fact and conclusions of law, plaintiffs claim that they are owed: (1) $100,000 for the deposit not paid by MDI in accordance with paragraph 6 of the Letter of Intent; (2) $17,534.99 for the mortgage payment not made to First National Bank of Newtown for the month of August 1989; (3) $5,604.74 for the mortgage payment not made to the Bank of Old York Road for the month of August 1989; (4) $5,850.90 for the real estate taxes not paid by MDI for the year 1989; and (5) $83,056.32 which represents the value of plans, surveys and studies performed by John Rahencamp Consultants, Inc. which were not provided to plaintiffs in accordance with paragraph 9(F) of the Letter of Intent. Plaintiffs thus allege that they are entitled to damages in the total amount of

$212,046.95, plus interest at the rate of six percent per year.

In response, MDI first argues that it should not have to pay McBrien the $100,000 demanded because: (1) consummation of the intended transaction was impossible; (2) plaintiffs' fraudulent misrepresentation excused performance by MDI;[2] (3) the Letter of Intent is unenforceable due to failure of a condition precedent; namely, the refusal of the banks to allow MDI to assume the mortgages; and (4) the $100,000 never became due, because that deposit was subject to the condition that an agreement of sale be signed. MDI next argues that a provision in the Letter of Intent limits MDI's liability to $100,000; therefore, if this court concludes that MDI owes McBrien $100,000 pursuant to paragraph 6, that should be the total amount of damages owed. Third, MDI concedes that it was obligated to make mortgage and tax payments but claims that all bills which accrued during the review period were paid by MDI. Finally, MDI acknowledges that it was obligated to share with plaintiffs copies of all studies, etc. produced, but claims that it has no such studies in its possession that it has not already turned over to plaintiffs and thus that it owes plaintiffs no damages. Alternatively, MDI contends that plaintiffs have failed to prove the value of the studies done by JRC and therefore that there can be no recovery.

## II.

### A. The $100,000 deposit

■ Paragraph 4 of the Letter of Intent, the full text of which was quoted above, gave MDI 120 days in which to evaluate the physical and economic feasibility of the project (the "Review Period"). That paragraph provided that "[d]uring the Review Period, Buyer and Seller shall negotiate an Agreement of Sale to be executed by Buyer and Seller on or before the termination of the Review Period." Notwithstanding that provision, para-

---

**2.** MDI also argues that plaintiffs' fraudulent misrepresentations were the direct and proximate causes of losses to MDI totalling $324,333.50, and that plaintiffs should be required to reimburse MDI in that amount. Defendant, however, did not bring a counterclaim against plaintiffs.

Indeed, defense counsel—who was not original counsel on the case—recognized as much, explaining that the defense asserted "would seem to cry out to me for a counterclaim; however, none such was pleaded." (11/23/93 Tr. at 4).

graph 4 allowed that, should MDI elect for any reason not to proceed with the intended purchase, MDI merely had to notify McBrien in writing of that decision and the Letter of Intent would be null and void.

Paragraph 6 of the Letter of Intent provided that, upon execution of the Letter of Intent, MDI would give $50,000 up front to McBrien. The parties do not dispute that MDI did in fact make this payment. Paragraph 6 then provided that, "[u]pon the expiration of the period referred to in Paragraph 4, Buyer will deposit an amount equal to One Hundred Thousand Dollars ($100,000.00) which shall be released to Seller." Finally, paragraph 6 explained that the $50,000 and $100,000 deposits "shall secure Buyer's obligations under this Letter and the subsequent Agreement of Sale and Buyer's liability shall be limited to same."

It is undisputed that MDI did not notify McBrien of its decision not to proceed with the intended purchase during the 120 period described in paragraph 4, which expired on or about August 18, 1989. Up until September 14, 1989, when MDI learned from JRC that it could expect to develop only fifteen lots on the property without a curative amendment, both parties appeared confident that they would in fact sign an agreement of sale. On September 15, MDI informed McBrien that it would not proceed with the project.

McBrien relies upon language in paragraph 6 to support its argument that the $100,000 came due upon the passage of 120 days, regardless of whether an agreement of sale was signed. Specifically, McBrien focuses on the sentence in paragraph 6 that states: "Upon the expiration of the period referred to in Paragraph 4, Buyer will deposit an amount equal to One Hundred Thousand Dollars ($100,000.00) which shall be released to Seller." McBrien argues that, because, in that sentence, the obligation to pay $100,000 was not qualified, the obligation was not contingent upon the signing of an agreement of sale.

MDI characterizes the $100,000 payment as a deposit to secure its obligations under an agreement of sale, and thus argues that its duty to pay was contingent upon the signing of such an agreement. I find this characterization of the $100,000 payment, and the corresponding conclusion that MDI's obligation to make the payment was contingent upon the signing of an agreement of sale, persuasive. Language in paragraphs 4 and 6 of the Letter of Intent, taken in the context in which the Letter was signed, supports MDI's position.

Paragraph 4 reveals that the parties contemplated that an agreement of sale would be signed within the 120 day period: "During the Review Period, Buyer and Seller shall negotiate an Agreement of Sale to be executed by the Buyer and Seller on or before the termination of the Review Period." The fact that the parties intended to sign an agreement of sale during the review period does not necessarily mean that the $100,000 payment due at the end of that period was contingent upon the signing of an agreement. It does, however, reveal that, at the time the Letter of Intent was executed, the sequence envisioned by the parties was, first, the signing of an agreement, then, the payment of $100,000.

Paragraph 6 characterizes the $50,000 and $100,000 payments as "deposit(s)" that "shall secure Buyer's obligations under this Letter and the subsequent Agreement of Sale and Buyer's liability shall be limited to same." The natural reading of this provision is that the $50,000 deposit secured MDI's obligations under the Letter of Intent; the $100,000 deposit was to secure its obligations under an agreement of sale. Plaintiffs argue in their response to MDI's post-trial brief that, had the parties signed a further agreement of sale, that agreement would have provided for an additional deposit. *See* Plaintiff's Response, at 15–16. This contention is implausible, however, because the sentence quoted from paragraph 6 limited MDI's total liability to $150,000.

Indeed, plaintiffs provide no plausible alternative to the characterization of the $100,000 payment as a deposit that would secure MDI's obligations under an agreement of sale. In their response to MDI's post-trial brief, plaintiffs contend that MDI was obligated to pay $100,000 in order to

continue exclusive negotiations with McBrien after the 120 day period expired. *See* Plaintiff's Response, at 15. However, I find it unlikely that the $100,000 payment was consideration for an extension of time in which to negotiate an agreement of sale. First, this sum—twice the amount of the initial deposit—seems exorbitant as consideration for an extension of time, particularly in light of the fact that MDI's obligation to make McBrien's mortgage payments continued during the period of negotiations. Moreover, the Letter of Intent contained no language that suggested that time was of the essence, and Dyer testified that no one indicated to him that time was of the essence. (1/14/93 Tr. at 65, 107). Thus, I am not convinced by plaintiff's suggestion that the $100,000 payment was consideration for an extension of time in which to negotiate an agreement of sale.

For the reasons given above, I am persuaded that the parties intended the $100,000 payment described in paragraph 6 of the Letter of Intent to be a deposit that would secure MDI's obligations under an agreement of sale. Logically, MDI's obligation to pay the deposit would arise only if the parties signed an agreement of sale. The parties did not sign an agreement of sale; therefore, MDI had no duty to pay McBrien the $100,000 plaintiffs demand in this lawsuit.[3]

B. *Mortgage payments and real estate taxes*

Plaintiffs also claim that MDI failed to make certain mortgage payments and to pay real estate taxes on the property as required by the Letter of Intent. Paragraph 8(C)(4) of the Letter of Intent provided:

Buyer agrees to pay the mortgage payments and real estate taxes on the land (One Million Five Hundred Thousand Dollars [$1,500,000] with First National Bank

of Newtown—20 years; self amortizing; payments at 1.5% over prime set every July; currently approximating $17,000 per month) and on the Inn (Five Hundred Thousand Dollars [$500,000] with The Bank of Old York Road—20 years; self amortizing; payments at 1.5% over prime set every 15th of the month; currently approximating $5,500) until settlement at which time Buyer will satisfy or assume said loans. The obligation to do the aforementioned begins at the signing of [the Letter of Intent].

MDI concedes that paragraph 8(C)(4) required it to make the mortgage payments that came due during the period of negotiations. *See* MDI's Post–Trial Brief, at 55. MDI contends, however, that it paid all monthly mortgage payments and real estate taxes, as they accrued, up until September 14, 1989. *See id.* In contrast, plaintiffs contend that MDI failed to make the August mortgage payments to First National Bank of Newtown, in the amount of $17,534.99, and to The Bank of Old York Road, in the amount of $5,604.74. Plaintiffs also claim that MDI failed to pay the 1989 real estate taxes, in the amount of $5,850.90.

■ As Ulrich testified, Plaintiffs' Exhibit 3 is a document that Ulrich prepared listing some of MDI's costs associated with the development of McBrien's property. (1/14/93 Tr. at 29). This document lists five months of mortgage payments made by MDI to The Bank of Old York Road, plus a $259.99 late fee for one of the payments.[4] Moreover, McBrien acknowledged in his direct testimony that MDI made the August mortgage payment to The Bank of Old York Road. (11/23/92 Tr. at 36). Thus I conclude that MDI did in fact make the August payment to The Bank of Old York Road, and that plaintiffs are not entitled to the $5,604.74 they demand for this alleged de-

---

**3.** Because I conclude that MDI's obligation to pay plaintiffs $100,000 was contingent upon the signing of an agreement of sale, I need not address MDI's arguments that impossibility, fraud, and/or the failure of a condition precedent preclude the enforcement of this provision.

**4.** Plaintiffs' Exhibit 3 shows the following mortgage payments to The Bank of Old York Road:

| | | |
|---|---|---|
| 5/3/89 | — | $5,604.74 |
| 5/25/89 | — | $5,604.74 |
| 6/28/89 | — | $5,604.74 |
| 7/12/89 | — | 259.99 |
| 8/18/89 | — | $6,501.46 |
| 8/27/89 | — | $5,604.74 |

fault. In contrast, plaintiffs' Exhibit 3 lists only three mortgage payments made by MDI to First National Bank of Newtown, apparently for the months of May, June and July.[5] McBrien testified that MDI did not make the August payment to First National. Because this testimony is not contradicted, I conclude that MDI failed to make the August payment to First National as required by the Letter of Intent, and thus that plaintiffs are entitled to the $17,534.99 it demands for this default.

McBrien testified that MDI failed to pay the real estate taxes on the Inn for the year 1989, and that the taxes for that year amounted to "five thousand eight hundred and some dollars." (11/23/92 Tr. at 37). In their post-trial brief, plaintiffs claim that they are owed $5,850.90 in unpaid real estate taxes. Plaintiffs' Exhibit 3, however, indicates that MDI made real estate tax payments in the total amount of $172.76.[6] Neither party directly contradicts the claim of the other; accordingly, I conclude that MDI owes plaintiffs the $5,850.90 claimed, less $172.76, for a total of $5,678.14.

## C. Feasibility and engineering plans

■■■ Paragraph 9(F) of the Letter of Intent permitted MDI to have access to the property and to perform tests and studies in connection with MDI's evaluation of the feasibility of the intended purchase. The last sentence of paragraph 9(F) provided that "Seller shall be provided with all copies of all work performed with respect to the property and all work shall become the property of Seller in the event this contract is terminated."

Plaintiffs claim that they are entitled to damages because MDI failed to turn over plans and other work produced as a result of the feasibility study. Specifically, plaintiffs claim that they should receive damages in

the amount of $83,056.32, the amount MDI lists in Plaintiffs' Exhibit 3 as the cost of JRC's services. MDI does not dispute that paragraph 9(F) required it to turn over to plaintiffs any plans it had in its possession, but contends that it has no plans in its possession and thus no duty. As Ulrich testified, on September 14, 1989, MDI told Rahencamp on September 14, 1989, that it was unhappy with him for misrepresenting the developability of the property and that it intended to litigate the matter. (1/14/93 Tr. at 129). Fraser testified that, because MDI refused to pay Rahencamp money that Rahencamp believed MDI owed him for JRC's services, Rahencamp refused to turn over any plans to MDI. (2/9/93 Tr. at 84).

Fraser testified that, in response to demands by Rufe and McBrien's daughter for plans, he explained that Rahencamp had not given MDI anything. Fraser added that he told Rufe and McBrien's daughter that they would have to obtain copies of the plans from Rahencamp directly. (2/9/93 Tr. at 84). In its post-trial brief, MDI argues that it has no plans in its possession that it has not already shared with McBrien. See MDI's Post–Trial Brief, at 56. Plaintiffs do not dispute this contention. I conclude that MDI's obligation under the Letter of Intent was only to deliver to McBrien copies of plans that it had in its possession. Indeed, McBrien seemed to concede as much in the demand letter Rufe wrote to Dyer, which stated the following demand:

1. That MDI turn over forthwith all plans, appraisals, engineering studies, test results, feasibility studies, plans, etc., *in their possession* as a result of the feasibility studies forthwith [sic].

(Plaintiffs' Exhibit 4) (emphasis added). Accordingly, I conclude that MDI breached no

---

5. Plaintiffs' Exhibit 3 shows the following payments made to First National Bank of Newtown:

| | | |
|---|---|---|
| 5/23/89 | — | $16,535.00 |
| 6/28/89 | — | $16,535.00 |
| 8/18/89 | — | $17,534.99 |

The 8/18/89 payment was apparently a payment for a mortgage obligation that came due in July.

6. Plaintiffs' Exhibit 3 shows the following payments made to cover real estate taxes:

| | | |
|---|---|---|
| 7/12/89 | — | $36.17 |
| 7/12/89 | — | $67.68 |
| 7/16 | — | $68.91 |

duty owed to plaintiffs by failing to turn over plans that it did not possess.[7]

### III.

For the reasons given above, I conclude that plaintiffs are entitled to an award of damages of $17,534.99 for the unpaid August 1989 mortgage payment to First National Bank of Newtown and of $5,568.14 in unpaid real estate taxes. Thus the total amount of damages awarded to plaintiffs is $23,103.13.

---

**7.** Regardless, plaintiffs have failed to mitigate whatever damages arose from MDI's failure to deliver plans. MDI contends in its post-trial brief that plaintiffs have made no substantial efforts to obtain copies of plans directly from JRC. *See* MDI's Post–Trial Brief, at 56. Plaintiffs do not indicate otherwise. Because plaintiffs have made no attempt to mitigate damages, they are not entitled to the damages they claim. *See, e.g., Taber v. Porter–Gildersleeve Co., Inc.,* 271 Pa. 245, 114 A. 773, 774 (1921) (recognizing duty to mitigate damages).